STATE OF WYOMING,

*Plaintiff and Respondent,*

vs.

ALBERT A. PAULAS,

*Defendant and Appellant.*

(No. 2664; August 23rd, 1955; 286 Pac. (2d) 1041)

270

■■■■■■■■■■■■■■■■■■

For the defendant and appellant, the cause was submitted upon the brief and also oral argument of T. C. Daniels of Douglas, Wyoming.

For the plaintiff and respondent, the cause was submitted upon the brief and also oral argument of Howard B. Black, Attorney General, of Cheyenne, Wyoming and M. R. Foe, County and Prosecuting Attorney, Platte County, Wyoming, of Wheatland, Wyoming.

## OPINION

RINER, Chief Justice.

The defendant and appellant, Albert A. Paulas, by direct appeal brings this case here from a judgment of the District Court of Platte County. The County and Prosecuting Attorney filed an information in that court wherein the defendant Paulas was charged with the crime of arson and that Paulas "on the 16th day of May, A. D. 1953 at the County of Platte, in the State of Wyoming, did wilfully and unlawfully and maliciously, set fire to and burn personal property consisting of one stack of hay, being of a value of $25.00, and in excess thereof, and the property of another, to-wit, that of Hubert Barkdoll  *   *   *." Under that charge a trial was had in said court before a jury and Paulas was found "guilty." He was sentenced to serve a term of imprisonment in the penitentiary at Rawlins, Wyoming, "for a period of not less than one year nor more than fifteen months." The trial court gave the defendant an exception to this sentence.

It appears that the defendant aforesaid undertook to try his own case and to dispense with the services of counsel trained in the task of handling cases in court. The district court explained the different steps taken in the trial of a criminal cause to Mr. Paulas, evidently with the idea of instructing Paulas just how a cause of this character was conducted. It is not clear that the defendant had ever been in a courtroom be-

fore in his life. After a course in voluminous explanations given the defendant by the court relative to legal procedure regarding the empaneling of the jury, the opening statements on behalf of the State of Wyoming through the county attorney, putting proposed witnesses "under the rule" until they were called for questioning, and how the questioning was conducted, direct and cross-examination, the jury trial was begun.

The criminal offense was charged to have been committed on the 16th day of May, 1953; and so far as the record discloses the facts, they are substantially as follows: The haystack which burned evidently was noticed burning early in the evening of May 16, 1953, somewhere around 8:00 P.M.; the stack was of native hay cut during the 1952 season by one Hubert Barkdoll on lands leased by him from a man by the name of Chroninger. The stack was on this leased land about one-half mile north of a county road which runs between the Barkdoll property and land owned by the defendant Paulas which adjoined this road on the south. This road was not oiled but had a gravel surface. The lands between the stack and the county road had been freshly plowed or worked on sometime prior to May 16, 1953—just when or by whom is not altogether clear.

The county road just mentioned is generally known in that vicinity as the "river road" and runs east and west between the two parcels of land mentioned. As already indicated, it had a gravel surface and carried considerable traffic. Its right of way was fenced on both sides. The width of the road was fixed by testimony to be sixty feet. When the fire commenced in the neighborhood of eight o'clock in the evening, as already noted, the fire siren was blown at Glendo, a town about two miles south and west of this place where the stack

was located. It seems that sundry people drove out from Glendo, driving to a point on the oil highway some distance west of the burning stack, from that point entering upon plowed land adjoining the stack on the west, and from there driving to a fence which ran approximately 476 feet west of the burning stack. The cars were apparently left at this point and the individuals crawled through the fence and got as close to the stack as they could—the heat therefrom obliging them to stray at some distance from it. It would seem that nothing was done—or could be done—except to let the stack burn.

The following morning, the 17th of May, tracks of some person were discovered in a plowed end furrow approaching the stack from the south, and tracks were found leaving the stack by the same plowed furrow. Nothing appeared to be said in the testimony as to how distinct these tracks were except that they were made by a person going northward and then coming southward. There was no testimony indicating whether the tracks overlapped each other or not. These tracks, according to the sheriff, testifying for the State, were traced to the north side of the river road and were attempted to be followed to the south side of the river road to the right of way fence on the south side of that road. It is claimed by the State that similar tracks were found on the south side of this road in the borrow pit and through the south right of way fence, heading in the direction of Albert Paulas's residence. Testimony was given that tracks were found leading to the entrance of the yard of the Paulas's residence but were lost at that place. It seems that somewhat similar tracks were found leaving the yard of the Paulas's residence and going in a northwesterly direction. They were traced to the river road. According to a blackboard map (copy of which appears in the record as

State's Exhibit No. 1), the two sets of tracks from the highway to the Paulas's house did not follow the same course; but it is claimed on behalf of the State that both sets of tracks were discovered across the river road from where the tracks to and from the stack in the plowed furrow were discovered on the road right of way on the north side. The witnesses for the State attempted to trace the tracks from one side of the river road to the other, but a careful reading of testimony of the Platte County sheriff who was the principal witness for the State regarding this matter demonstrates with reasonable clearness that there were no tracks that could be really identified positively on the gravel road itself. It was conceded in the testimony that this river road was well traveled, and it would appear that the State's case for connection of the tracks north in the plowed end furrow with those south of the road depended largely upon the fact that the tracks north and south of the road were measured and found to have the same measurements. They also had a heavier indentation on the outside of each foot track as they appeared on opposite sides of the river road.

When Mr. Paulas was interviewed at his home by the sheriff on the day after the fire—in the presence of several people who lived in that area—Paulas admitted that he had made the tracks south of the road as it was his property. Paulas also remarked that his tracks could undoubtedly be found all over his own property, claiming that the tracks south of the road had been made when a cow in some manner got into his land planted in wheat. Tracks mentioned in the State's testimony were also partially made while Paulas was using some machinery on his own land west of the railroad which runs west of the oil highway when certain machinery broke down there and he had to go back to his dwelling for a wrench or bolts.

At the request of the sheriff, Paulas without hesitation made tracks which were measured by the sheriff; and the latter testified that they bore the same measurement and had the same heavier indentation on the outer side of the foot as did the other tracks measured and examined by the sheriff both north and south of the river road. There was no other identification whatsoever. Connection of the defendant with the tracks north of the road depended solely upon the measurement of the length and width of the sole and the heel of the tracks and the heavier indentation on the outside of each print. It would seem that there was nothing else about the tracks which could be or was claimed would identify as to the person who made the tracks. At this point, it may be observed that no one saw the fire set—if it was set.

On the morning after the fire which occurred on the evening of May 16, 1953, the sheriff of Platte County claimed to have found a set of footprints leading from the north side of the river road through the right of way fence and into an end furrow which extended for a half-mile north to a point about twenty-seven feet west of the burned stack. According to the sheriff, they were traced from that point to the stack. The map which appears in the record, and which is not altogether accurate in corresponding with the testimony in the record, seems to indicate that the tracks on the north side of the river road and the tracks south of the river road were about opposite. The tracks south of the river road were conceded to have been made by Mr. Paulas. It was found upon comparison with prints made on the Paulas property south of the river road that they resembled somewhat those found on the north side of the river road in the end furrow. The sheriff himself testified positively that they were the same identical tracks and had the same peculiarities. Paulas

stated in his testimony that he had no knowledge of the tracks that appeared in the end furrow north of the river road. As to the tracks on the south side of the river road on his own property, he said—as mentioned above—that one set of them had been made when a cow belonging to him had gotten into his wheat field and the other, set of tracks on his own property had been made in connection with his trip home to get some tools to repair the machinery which had broken down in use. The sheriff and the witnesses for the State especially emphasized that the prints in the plowed field to and from the stack that burned north of the road were identical. There was no evidence of the tracks being made by Paulas in the end furrow north of the river road. There was evidence from which it could be deduced that lightning the evening of the 16th had caused the fire. This fact was disputed. The State's witnesses were allowed to give their opinion as to the origin of the fire. It will be remembered that the defendant undertook to conduct his own defense in this case with the result that there was no thorough cross-examination of the witnesses for the State. There is no evidence in the record either that the fire may not have been caused by spontaneous combustion, there being no testimony or evidence as to the condition of the stack just prior to the time when the fire started in it.

The judge bearing in mind that the defendant was endeavoring to try his own case stated:

" * * * the record may show that it is understood here that Mr. Paulas, the defendant, may have an objection to each and every question asked by the State of its witnesses and it is understood that he may have an exception to each and every answer that is made to those questions."

The court also said that it had been suggested to the County and Prosecuting Attorney to be very careful

"not to ask leading questions." The court pointed out that Mr. Paulas did not understand procedure and would not object as a lawyer who had had legal training might. However, the record is barren of any action taken by the court during the examination of the State's witnesses showing that the court interposed and stopped the prosecuting counsel from using leading questions. The following testimony given by the sheriff will show how far counsel for the State was permitted to go in obtaining testimony by leading questions.

"Q. Was there any similarity to those tracks (the tracks south of the river road) with the ones you had measured in this end furrow? A. They were identical tracks, yes. * * *

"Q. What did you observe from those measurements? A. They were the same identical tracks as these coming this way, these that were going north.

"Q. Were these measurements you have testified to the same? A. That's right.

"Q. Were they identical and the same that you have testified were made in this end furrow? A. That's right.

"Q. And over on the Barkdoll land? A. Absolutely.

"Q. And right to and up to the haystack? A. That's right. * * *

"Q. Identical in size with those you had measured throughout the whole line of travel from the burned haystack to the Paulas home—well, back as far as you measured back? A. Yes.

"Q. Was there anything else identifying about these tracks that you saw Mr. Paulas make that you examined in his yard? A. There is.

"Q. What is it? A. That same indentation, that deeper indentation on the outside of the foot, outside of the shoe.

"Q. Same size, same indentation? A. Same thing, absolutely.

"Q. And Mr. Paulas told you very clearly when viewing these tracks approaching from the northwest and leaving that they were his tracks? A. His tracks.

"Q. Were they the same tracks you followed from the fence past the haystack— A. (Interposing) They were.

"Q. —from his home? A. They were.

"Q. Are you certain that they were the same measurements, same tracks that you had observed as the tracks that came from the end furrow near the haystack and back? A. They are.

"Q. Measured them not once but many times? A. Many times.   *   *   *

"Q. I may have asked you this question. I might have asked you: Did those tracks compare closely as to measurement and appearance with the tracks anywhere else from Point A clear to point K that you had observed and measured? A. They did.

"Q. How closely did they compare? A. Exactly. *   *   *

"Q. Did you, however, observe the same tracks and loose gravel in the middle of that road? A. Yes.

"Q. Was there any question in your mind as to the measurement and identification of those tracks as to impressions on the west shoulder or center portion of the tracks? A. There wasn't.

"Q. That was true on the south as well as the north portion of the road, was it? A. That's right.

"Q. Did you testify that you found one particularly good track that was circled on the north shoulder? A. That's right.

"Q. Measured and remeasured it? A. I did.

"Q. Did you follow those tracks any on Monday, the 18th? A. I did, that's right.

"Q. Is there any doubt in your mind as to the continuity of those tracks followed from Point A clear across this road south and then following them across the Paulas field? A. Not a bit in the world."

Another witness was allowed to testify:

"Q. Did you compare them with the other measurements? A. Exactly.

"Q. Did you mark them down? A. I marked them down also.

"Q. Did they compare identically with the tracks you had followed from the haystack out there over to the Paulas place? A. They did.

"Q. Was there any peculiarity about those tracks that enabled you to identify them? A. They had a heavy imprint on the outside of the track, the same track.

"Q. In other words, you identify—was it the same track? A. They were the same track."

The following excerpt from the record also is to be noted where the county attorney testified in the case for the State although he had never been sworn so far as the record shows:

"Q. Who was in your company at that time? A. Oh, Mr. Foe, yourself.

"Q. I was, that is true? A. Yes."

In connection with this testimony, it will be recalled that 23 C.J.S. 90 states that:

" * * * except in some jurisdictions, a witness will not be permitted to state his belief, opinion, or conclusion that certain tracks were made by accused * * *."

See also Daugherty v. State, 28 Ala. App. 453, 186 So. 780, 781, where the court said:

"Appellant was entitled to a trial in full conformity to Sec. 6 of the Constitution of 1901 which provides, among other things, that 'in all criminal prosecutions, the accused * * * shall not be compelled to give evidence against himself.'

"One of the principal bits of evidence by which appellant was sought to be connected with the burning of the barn in question was a series of tracks (made by a human being) leading toward and away from the said barn.

"After the barn had burned during the nighttime, on the morning following, the Sheriff of the County took appellant—either under arrest or duress—and 'had him put his foot in this track' (one of the tracks referred to above). And over appellant's objection—due exception being reserved—the Sheriff was allowed to testify on the trial that 'it was exactly the same'— meaning appellant's foot exactly fitted said track.

"Further elaborating—all over appellant's objection, with due exception reserved—the Sheriff was allowed to testify, substantially, that he 'took hold of the defendant's foot and * * * placed it in the track.' "The above procedure, with the detailing of it in the testimony, constituted a clear violation of appellant's rights as set forth in the Section of the Constitution quoted from above. Cooper v. State, 86 Ala. 610, 6 So. 110, 4 L.R.A. 766, 11 Am. St. Rep. 84."

In connection with this case, the first sentence in section 11 of Article I of our Constitution reads: "No per-

son shall be compelled to testify against himself in any criminal case, nor shall any person be twice put in jeopardy for the same offense."

In Lee v. State, 27 Ariz. 52, 229 P. 939, 942, the court citing many cases from other jurisdictions, remarked:

"The witnesses were permitted to state, in effect, that they had compared the shoes of appellant with the tracks near the mesquite where Allred was shot and those leading to the Evans house, and that, in their opinion, the tracks were made by the owner of the shoes, and that there could be no doubt about it. One witness went so far as to say that it was not possible for the tracks to have been made by any other shoes. In this manner of stating the evidence we think the witnesses were permitted to go too far. The witnesses should have been permitted to state the facts observed by them, as, the size of the tracks as compared with the shoes, the peculiarities of the shoes indicated in the tracks, the measurements, etc., and left any deductions of conclusions to be drawn by the jury. This seems to be the rule observed by the courts in most of the cases."

An examination of the record demonstrates that the conviction of the defendant was obtained on purely circumstantial evidence. Yet, the trial court gave no satisfactory instruction as to circumstantial evidence in accord with what this court had previously declared should be done in such cases. The rule announced in the case of Gardner v. State, 27 Wyo. 316, 323, 335, 196 P. 750, 751, 756, cannot be overlooked where this court said:

"It is held by the best and weight of authority that the law of circumstantial evidence in criminal cases is that—'In order to convict on circumstantial evidence, it is held necessary, not only that the circumstances all concur to show that the prisoner committed the crime, but that they all be inconsistent with any other rational conclusion. * * * Again, if the circumstances, no matter how strong, can be reasonably re-

conciled with the theory that some other person may have done the act, the defendant should not be convicted, and a verdict of guilty will be set aside as contrary to law. * * * While the evidence must lead to the conclusion so clearly and strongly, where the evidence is purely circumstantial, as to exclude every reasonable hypothesis consistent with innocence, still it is not necessary that the evidence should produce absolute certainty in the minds of the jurors, or that it should dissipate mere conjectures and speculative doubts, for metaphysical and demonstrative certainty is not essential to proof by circumstances. It is sufficient if the evidence produce moral certainty, to the exclusion of every reasonable doubt.' 8 R.C.L. 225, 'While absolute certainty is not essential, yet the evidence must be of such a character as to satisfy the jury of defendant's guilt, and to exclude every other hypothesis to a moral certainty beyond a reasonable doubt; evidence creating a mere probability of guilt is not sufficient; much less is evidence which gives rise to mere suspicion or conjecture of guilt."

In the same case, this court also stated:

" * * * we give our views on the question of instructions regarding circumstantial evidence where such evidence is wholly relied upon for conviction as a guide in case of a new trial of this case and in other such cases in the state, and we believe that the court should, in such cases, instruct on the law regarding circumstantial evidence, whether requested to or not, as being fundamental to the defendant's having a fair trial, such as the constitution and laws guarantee to him."

Quite in line with what this court said in the Gardner case is an excellent discussion of the law of circumstantial evidence in criminal cases as set forth in State v. Kimbrell, 191 S.C. 238, 4 S.E. 2d 121, 122; that court in discussing the same point as was before this court in the Gardner case used this language:

"Every circumstance which is relied upon by respondent as material must be brought to the test of strict

proof. All of the facts proved must be consistent with each other, and, taken together, should be of a conclusive nature and tendency, producing a reasonable and moral certainty that the appellant and no one else committed the offense charged. It is not sufficient that they create a probability, though a strong one; and if, therefore, assuming all the facts to be true, which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of appellant, then the proof fails. The reason for this is that all presumptions of law, independent of evidence, are in favor of innocence, and every person is presumed to be innocent until he is proved to be guilty. As has often been stated, it is not sufficient to establish a probability of guilt arising from the doctrine of chances that the fact charged is likely to be true."

See also to the same effect Anthony v. State, 30 Ala. App. 425, 7 So.2d 513, 516—the court saying at the conclusion of its opinion that:

"Practically all the questions discussed herein above were made grounds for defendant's motion for a new trial. There was error in overruling and denying said motion."

Keeping in mind what was said as above pointed out in the Gardner case, we cannot disregard the failure of the court to give a proper instruction on circumstantial evidence. The instruction given by the court on circumstantial evidence was as follows:

"The Court instructs the jury that circumstantial evidence in criminal cases as contra-distinguished from what is termed direct evidence, is the proof of such facts and circumstances connected with, or surrounding the commission of the crime charged as tend to show the guilt or innocence of the defendant; and if these facts and circumstances are sufficient to satisfy the jury of the guilt of the defendant beyond a reasonable doubt, then such evidence is sufficient to authorize the jury in finding the defendant guilty. As a matter of law, circumstantial evidence is just as legal and just as effective as any other evidence, providing that the

circumstances are of such a character and force as to satisfy the minds of the jury of the defendant's guilt beyond a reasonable doubt."

It is quite apparent upon examination of this given instruction that it is wholly inadequate to meet the requirements pointed out in the Gardner case. It merely states briefly the distinction between circumstantial evidence and direct evidence. It tells the jury that if the circumstances are sufficient to satisfy that body of the guilt of the defendant beyond a reasonable doubt they may convict and also that circumstantial evidence is just as legal as any other evidence, providing the circumstances are of such a character and force as to satisfy the minds of the jury of the defendant's guilt beyond a reasonable doubt. This being the situation in the case regarding the important point of circumstantial evidence, we are inclined to the view that the judgment of conviction should be reversed and the case remanded to the District Court of Platte County for a new trial.

*Reversed and new trial ordered.*

BLUME, J., and HARNSBERGER, J., concur.